No. 20-50361

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

JOEL ALEXANDER WRIGHT,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court*
*for the Southern District of California*
*No. 16-CR-0454-DMS*

**SUPPLEMENTAL EXCERPTS OF RECORD
(REDACTED)**

RANDY S. GROSSMAN
  *Acting United States Attorney*

DANIEL E. ZIPP
  *Assistant U.S. Attorney*
  *Chief, Appellate Section*
  *Criminal Division*

JOSEPH S. GREEN
  *Assistant U.S. Attorney*

  *880 Front St., Rm. 6293*
  *San Diego, CA 92101*
  *(619) 546-6955*

## TABLE OF CONTENTS

Page

Order Denying Motion for Sentence Modification Under
  18 U.S.C. § 3582(c), 12/21/2020 (R 65)      3

Reply to the Government's Response in Opposition
  to Mr. Wright's Motion to Reduce Sentence With
  Exhibit, 10/09/2020 (R 61, 61-1)      10

Response in Opposition to Wright's Motion to Reduce
  Sentence Pursuant to Frist Step Act (2018)/18 U.S.C.
  § 3582(c)(1)(A)(i), 10/02/2020 (R 60)      21

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 16-CR-354-DMS |
|---|---|
| Plaintiff, | **ORDER DENYING MOTION FOR SENTENCE MODIFICATION UNDER 18 U.S.C. § 3582(C)** |
| v. | |
| JOEL WRIGHT, | |
| Defendant. | |

On September 16, 2020, Defendant Joel Wright filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). The United States filed a response in opposition, and Defendant filed a reply. For the reasons given herein, the Court denies Defendant's motion.

## I.

## BACKGROUND

On April 13, 2016, Defendant Wright pled guilty to one count of attempted enticement of a minor, in violation of 18 U.S.C. § 2422(b). (ECF Nos. 24, 26.) Defendant was sentenced to 188 months in prison, followed by a lifetime term of supervised release. (ECF No. 45.) Defendant's projected release date is in June of 2029. (ECF No. 51 at 2.)

Defendant is twenty-eight years old; he suffers from a range of medical conditions, as described in detail in his sealed filings. (*See* ECF No. 54; Ex. J to ECF No. 51.)

Defendant is currently incarcerated in FCI Danbury. (ECF No. 51 at 1.) Based on these allegations and the risks associated with COVID-19, Defendant filed the present motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), seeking a reduction of his sentence to time served. (*Id.*) The United States opposes Defendant's motion. (ECF No. 60.)

## II.

## DISCUSSION

In general, a court may not modify a sentence of incarceration once it has been imposed, unless expressly permitted by statute or Rule 35 of the Federal Rules of Criminal Procedure. *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003). The First Step Act ("FSA") is such a statute. *See* Pub L. 115-391, 132 Stat. 5194, 5239 (2018). Among the criminal justice reforms implemented by the FSA, Congress amended 18 U.S.C. § 3582(c)(1)(A) to allow the defendant to move the district court for compassionate release after exhausting the Bureau of Prisons ("BOP") process.

Section 3582(c) of Title 18 of the United States Code provides that a court may not modify a term of imprisonment except "upon motion of Director of the Bureau of Prisons, or upon motion of the defendant." A defendant may bring a § 3582(c) motion after she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons" to act or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Administrative exhaustion is a prerequisite to filing the motion in district court, and "[e]xhaustion occurs when the BOP denies a defendant's application or lets thirty days pass without responding to it." *United States v. Mondaca*, No. 89-cr-0655-DMS, 2020 WL 1029024, at *2 (S.D. Cal. Mar. 3, 2020) (internal quotation marks and citations omitted). Here, Defendant submitted a request for compassionate release to the warden of FCI Danbury, which was denied on April 30, 2020. (Ex. Q to ECF No. 51.) Accordingly, the Court addresses the merits of Defendant's motion.

1    The FSA allows a district court to modify a sentence and grant compassionate release
2    if it finds "extraordinary and compelling reasons" warrant such a reduction, the reduction
3    complies with 18 U.S.C. § 3553(a), and the defendant "is not a danger to the safety of any
4    other person or to the community."   *See* 18 U.S.C. § 3582(c)(1)(A); United States
5    Sentencing Guidelines ("U.S.S.G.") § 1B1.13.  Defendant contends he meets the foregoing
6    criteria.  As the movant, Defendant bears the burden of establishing that he is eligible for
7    a sentence reduction.  *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

8        1.  Extraordinary and Compelling Reasons

9        Defendant argues he is eligible for compassionate release because his disabilities
10   and underlying health conditions, in combination with his conditions of confinement,
11   render him unable to care for himself and make him particularly susceptible to COVID-19.
12   The Sentencing Guidelines provide that extraordinary and compelling reasons may exist
13   for compassionate release where a defendant suffers from, among other conditions, "a
14   serious physical or mental condition … that substantially diminishes the ability of the
15   defendant to provide self-care within the environment of a correctional facility and from
16   which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. 1(A)(ii).

17       The United States does not address Defendant's medical issues in its response.
18   Rather, it contends even if Defendant has presented "extraordinary and compelling
19   reasons," he is not entitled to compassionate release because he has neither demonstrated
20   that he is not a danger to others or the community nor that the § 3553 factors weigh in favor
21   of release.  The Court agrees and thus need not decide whether Defendant's conditions
22   constitute "extraordinary and compelling reasons."

23       2.  Danger to Others or the Community

24       Even where extraordinary and compelling reasons exist, the court must consider
25   whether the defendant is "a danger to the safety of any other person or to the community,

as provided in 18 U.S.C. § 3142(g)."[1]  U.S.S.G. § 1B1.13(1)(A), (2), cmt. 1.  To make this assessment, the Court is directed to the factors set out in § 3142(g), including, among other things: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the person, including character, physical and mental condition, family ties, employment, financial resources, past conduct, criminal history, and drug and alcohol abuse; and (3) the nature and seriousness of the danger to any person or the community that release would impose.  These factors overlap with the § 3553(a) factors.

Here, the disturbing nature of Defendant's crime and his predatory conduct present significant public safety concerns.  Defendant was convicted for attempting to "rent" female infants in order to sexually abuse them.  (*See* Pre-Sentence Report ("PSR"), ECF No. 33, ¶¶ 5–24.)  Defendant, who had previously posted an advertisement volunteering to babysit young children, stated in his online communications that he had prior sexual experience with infants.  (*Id.* ¶¶ 9, 25.)  After numerous discussions in which he declared in detail his intentions to "adopt" and rape young girls, Defendant made plans to travel for that purpose and was arrested after flying cross-country with candy, lubrication, children's pain medication, and cash in his duffle bag, (*Id.* ¶¶ 15–21.)

---

[1] Defendant argues U.S.S.G. § 1B1.13's dangerousness requirement applies only to a "sentencing reduction" under 18 U.S.C. § 3582(c)(1)(A)(ii) and not to "compassionate release" under § 3582(c)(1)(A)(i).  (ECF No. 61 at 2 n.1.)  The Court finds this argument unpersuasive.  The First Step Act provides that a sentence reduction under either subsection of § 3582(c)(1)(A) must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  The relevant policy statement, U.S.S.G. § 1B1.13, states that a court may reduce a term of imprisonment if it finds all three of the following: (1) the defendant has either presented extraordinary and compelling reasons or met statutory criteria regarding his age and sentence; (2) the defendant is not a danger to the community; and (3) the reduction is consistent with the policy statement.  Accordingly, the Court addresses dangerousness regardless of how the defendant satisfies the first element.  *See* U.S.S.G. § 1B1.13, cmt. 1 (defining "extraordinary and compelling reasons," but noting defendant must meet "requirements of subdivision (2)," *i.e.*, dangerousness analysis).  In any event, even if Defendant were correct, the § 3553(a) factors encompass dangerousness by requiring the Court to consider the need to protect the public, as Defendant acknowledges.

Defendant argues his health and disabilities have worsened while incarcerated, making him less dangerous than he was at the time of the offense. The United States contends Defendant was already legally blind with restricted mobility when he committed his crime, and that these conditions did not prevent him from repeated online solicitations and cross-country and international travel. Although the Court credits Defendant's evidence that Defendant's conditions have worsened while in custody, the Court agrees with the United States that Defendant's abilities are not so diminished as to render him unable to recidivate.

Defendant points to additional factors such as community support, but after consideration, the Court finds these factors do not outweigh the nature and seriousness of the danger Defendant presents. Defendant has not met his burden to show he would not pose a danger to the community if released. Moreover, even if he could make such a showing, the balance of the § 3553(a) factors weigh decidedly against release, as discussed below.

### 3. § 3553(a) Factors

Finally, the Court must consider "the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Section 3553(a) provides that the sentencing court must impose a sentence that is "sufficient, but not greater than necessary … (A) to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)–(D). The court also must consider, among other factors, "the nature and circumstances of the offense and the history and characteristics of the defendant" and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(1),(6).

Defendant argues that the time he has already served—approximately one-third of his 188-month sentence—is sufficient to satisfy the purposes of sentencing.  Defendant contends that his blindness has made his incarceration more punitive, and points to his family support and desire to seek help.

Many of the § 3553(a) factors overlap with the § 3142(g) factors already addressed, including the seriousness of the offense, protection of the public, and history and characteristics of the defendant.  The Court acknowledges Defendant's history and characteristics, including positive support from family members and others as well as his various health ailments and difficult childhood.  On balance, however, the § 3553(a) factors weigh squarely against release. As discussed above, there is a strong need to protect the public, and as Defendant rightfully recognizes, his offense was "incredibly serious." (ECF No. 51 at 28.)  Moreover, given the nature of Defendant's conduct, the need to provide just punishment and promote respect for law in this case is significant.  Defendant has a lengthy amount of time remaining on his sentence.  "To so dramatically reduce [Defendant's] sentence … would neither be just nor promote respect for the law; if anything, it would promote disrespect for the law." *United States v. Asmodeo*, 2020 WL 3268530, at *3 (S.D.N.Y. June 17, 2020) (denying motion for compassionate release where defendant was sentenced to 180 months for sexual exploitation of children and granting release would cut defendant's sentence by nearly two-thirds).

In sum, Defendant's 188-month sentence is not greater than necessary to address § 3553(a)'s overarching goals of punishment, deterrence, protection of society, and rehabilitation.  These factors weigh against releasing Defendant at this time.

### III.

### CONCLUSION AND ORDER

For the foregoing reasons, Defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) is respectfully denied.

**IT IS SO ORDERED.**

**/ / /**

Dated:  December 21, 2020

Hon. Dana M. Sabraw
United States District Judge

16-CR-354-DMS

1
2
3
4
5
6

**CHANDRA L. PETERSON**
California State Bar No. 306935
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chandra_Peterson@fd.org

Attorneys for JOEL WRIGHT

7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15

| UNITED STATES OF AMERICA, | CASE NO.:  16CR0354-DMS |
|---|---|
| Plaintiff, | REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO MR. WRIGHT'S MOTION TO REDUCE SENTENCE |
| v. | |
| JOEL WRIGHT, | |
| Defendant. | |

16

## I.    INTRODUCTION

17
18
19
20
21
22
23
24

No matter how much the government wishes it to be, Mr. Wright is not defined by his conviction. Ours is not a system where justice is refused to those who have committed even the most heinous of offenses. Section 3553(a) does not choose which crimes merit certain considerations and which do not. Rather, all of the § 3553(a) factors must be weighed in each case, even serious ones such as Mr. Wright's. The government's response in opposition fails to engage in any meaningful analysis under § 3553(a) and focuses all of its attention on Mr. Wright's offense conduct – only one of the considerations this Court must weigh.

25
26

For all of the reasons discussed in his motion and this reply, Mr. Wright requests this Court grant his request for compassionate release.

27

## II.    MR. WRIGHT'S REPLY TO THE GOVERNMENT'S RESPONSE

28

The government argues that this court should deny Mr. Wright's request for

compassionate release because he is dangerous and "the medical problems he cites now are essentially the same problems that did not prevent his crimes." Intertwined in these two points, the government revisits Mr. Wright's offense conduct in great detail while brushing aside Mr. Wright's detailed description of his medical conditions, the experiences he has had in prison for the past five years, the relationship between his health issues and COVID-19, the BOP's failure to provide him with counseling and sex offender treatment, Danbury's wholly inadequate response to COVID-19, the expert's opinion (from the original sentencing) about the unlikelihood of recidivism, his inability to care for himself in custody (which will not change once released), and his immense family support. All of these are considerations that this court must weigh when considering Mr. Wright's motions.

## A. The government's dangerousness analysis is incomplete.

The government argues that because of the circumstances that led up to Mr. Wright's offense and because his medical problems are "essentially the same problems that did not prevent his crimes" he is dangerous and this Court should deny his motion.[1]

First and foremost, it is important the record be clear that Mr. Wright's medical conditions are not "essentially the same" as the medical conditions that "did not prevent his crimes." At the time of his offense and in the other circumstances prior to Mr. Wright's offense detailed in its response, Mr. Wright could still see, albeit he could not see well. Mr. Murphy, his prior counsel attests to his abilities at the time of his arrest versus his abilities at sentencing. *See* Exhibit AA, Declaration of Gregory Murphy, October 9, 2020. Mr. Murphy indicates that

---

[1] The government accuses Mr. Wright of "not acknowledging" the dangerousness requirement. *See* Gov. Br. at 2. The "dangerousness requirement" under U.S.S.G. § 1B1.13 only applies to sentencing reductions under 18 U.S.C. § 3582(c)(1)(A)(ii). Mr. Wright has filed a request for compassionate release under (c)(1)(A)(i). This is not to say that dangerousness is irrelevant. Rather, it is encompassed in the § 3553(a) factor "need to protect the public," and this is where Mr. Wright discussed it in his motion. Indeed, the government responds to Mr. Wright's argument that he is no longer a danger because of his deteriorated health.

when he first met Mr. Wright and at the beginning stages of his case, Mr. Wright could still see. *Id.* He would hold papers up close to his face so he could read them himself. *Id.* As a consequence of GEO's failure to treat Mr. Wright's glaucoma, Mr. Wright's eyesight deteriorated significantly and at sentencing he was essentially blind. *Id; see also* Exhibit BB 2016 Documentation of Health Issues. Unlike at the time of the offense, Mr. Wright is now completely blind.

The change in his abilities is detailed significantly in Mr. Wright's declaration to this court where he recounts what it is like for him to live a day in custody. Mr. Wright cannot survive in prison without the assistance of others. This was not the case prior to his arrest in this case. Now, from the very beginning of the day, he needs others to help him – he cannot eat without the assistance of others to collect his tray. Prior to COVID-19, Mr. Wright had a companion that was housed in another unit. His companion would be the one to meet him in his bunk area and escort him to the bathroom so he could use the restroom and brush his teeth. Mr. Wright uses a cane for the blind, but cannot get anywhere in the facility without the assistance of someone else. His companion is responsible for taking him to commissary, filling out the commissary paperwork, reading him posted announcements (something that has been very important since COVID-19), reading him his mail and writing his letters, and taking him to get his medications. Since COVID-19, Mr. Wright has struggled even more to complete his daily tasks. Despite his requests, he has not been given a new companion in his own unit, and his prior companion is not allowed to come to his unit for safety reasons under COVID-19 protocols. Mr. Wright has asked for assistance and a new companion, and has been denied these requests. *See* Ex. M.

To simply categorize Mr. Wright's disabilities as "essentially the same problems" as those he had prior to being arrested is not true. The government relies heavily on this inaccurate proposition by claiming that "despite already being legally and functionally blind," Mr. Wright was able to attempt this offense in the

3                                          16CR0354-DMS

first place. In other words, he was dangerous then and is dangerous now because he has "essentially the same problems." The assessment of how dangerous or not dangerous Mr. Wright is must include his actual capabilities to commit any future offense. He cannot collect his own food tray or navigate to the restroom. He is completely blind now and was not at the time of the offense. In short, he does not have "essentially the same problems" as he did at the time of his offense conduct. His health is far worse and this makes him less dangerous than he was at the time of the offense.

Most importantly though, is not whether or not Mr. Wright is physically able to be dangerous. It is whether he will be. This analysis of dangerousness and protecting the public contemplates so much more than the offense conduct itself, which is the only real factor the government analyzes. Other factors that can help determine if someone might recidivate (and if the public needs protecting from them) include the kind of community support a person has, recidivism statistics known about certain offenses, their remorse and desire for treatment (or vice versa), and their ability to reoffend.

As Mr. Wright outlined in his motion to this court, all of these considerations weigh in favor of a finding that the public can be adequately protected through his request of home confinement and strict supervised release conditions. First, Mr. Wright has incredible support not just from his family who will be there by his side when he is released, but also from others, unrelated to him, who he has maintained relationships with since being in custody. The government's allegation that "Wright also apparently hid a dark, significant part of his life from everyone," again only accounts for what occurred prior to Mr. Wright's offense. Indeed, the letters of support for compassionate release from others suggest that Mr. Wright has been open with others about his conviction and his struggles and has maintained healthy relationships with supportive individuals so he will have a strong support system once he is released. He has multiple people who are not related and have no personal

stake in his release requesting this court consider his compassionate release motion.

Another factor to consider when contemplating protecting the public, is the likelihood of recidivism. One way to evaluate that is through statistics, such as the ones discussed by Mr. Murphy and the Court at sentencing and discussed in a DOJ Research Brief. *See* Ex. W. The recidivism rate for a "normal" individual in Mr. Wright's circumstances is only 11.1%, as discussed by Mr. Murphy at sentencing. *See* Dkt. No. 59 at 29. Of course, the likelihood of Mr. Wright's recidivism is diminished from this number because of his physical disabilities and other ways in which he is not the normal kind of offender.

Additionally, Mr. Wright was evaluated by an expert who worked for the BOP for years who also opined that Mr. Wright was unlikely to reoffend. Mr. Murphy, at sentencing, explained to the Court that he hired this expert not to create a report for the Court, but to assist the client in his wishes to understand his disease better and how he could manage it once he was released. Dkt. No. 59 at 14-18. What happened though was this expert who had worked for the BOP for many years – including the MCC in San Diego – opined that Mr. Wright would "likely follow whatever conditions of supervision are placed upon him" and that he "appeared motivated to learn to understand and to control any behavior(s) that would cause harm to others." *See* Ex. V at 4-5. The expert did not sugarcoat the situation, stating in the same breath that "Mr. Wright attempted to commit a heinous crime." Importantly, the expert appropriately parsed out Mr. Wright's likelihood of reoffending with his personal feelings about Mr. Wright's offense conduct. Something the government has failed to do, and is now asking the Court to follow suit.

The Court should also consider Mr. Wright's continuance plea for help, early of acceptance of responsibility, and continued desire for treatment in determining whether his promises to remain law abiding are sincere. From the beginning of this case, Mr. Wright has accepted responsibility and sought help. Even before being

16CR0354-DMS

SER-014

1  arrested in this case, Mr. Wright had sought help from members of his clergy and

2  been denied help. Mr. Wright is not "hid[ing] a dark, significant part of his life"

3  anymore. He is here, asking from help from everyone – family, the Court, others in

4  his community.

5        This all cuts against the argument that revising Mr. Wright's sentence to one

6  that is a sentence of home confinement cannot protect the public.

7  **B.    The government does not engage with the remaining § 3553(a)
8          factors.**

9        The government fails to meaningful engage in the remainder of the § 3553(a)

10  factors. While Mr. Wright does not intend to rewrite his entire motion here, there

11  are a few point worth of mentioning. First, the government cherry picks portions of

12  the sentencing transcript highlighting this Court's concerns about Mr. Wright, but

13  leaves out all of the positive characteristics the Court also weighed. For example,

14  the government points out that the Court thought about punishment, stating that Mr.

15  Wright's offense was "'horrific,' 'most deserving of punishment for punishment's

16  sake alone,' and 'most deserving of imposing a sentence that will protect society.'"

17  Gov. Br. at 7; Dkt. No. 59 at 34.

18        Only seconds later though, the Court found the following:

19        The history and characteristics attributed to you, outside of this area,
          are overwhelmingly positive. I read with great interest the letter from
20        your mother and your doctor, family doctor, Evans, and I appreciate
          their both being here. You enjoy a great deal of family support, and
21        you are very fortunate and blessed to have that. I accept the
          representations that you have a deep and abiding faith, you find great
22        solace in the church and I accept the representation that you were
          attending church and interested in the priesthood for all of the right
23        reasons.

24  Dkt. No. 59 at 35. These and other positive characteristics are highlighted in detail

25  in Mr. Wright's motion for compassionate release.

26        The government also fails to meaningfully engage with Mr. Wright's

27  medical issues – to the point where it is even unclear if the government is arguing

28  that Mr. Wright has not met extraordinary and compelling circumstances. Not only

is Mr. Wright blind, but he also has a plethora of other medical issues that the government completely ignores. Mr. Wright is not an individual who can get around from place to place without assistance and he is not going to be someone who could up and flee on supervision without any trace. He is going to for the rest of his life need continuous medical attention, Medicare, social security and disability – all that will require him to lead a law-abiding life and for the federal government to know where he is. His medical conditions are certainly a consideration under § 3553(a) factors because of the suffering he has endured and overcome, but they are also practical considerations when determining other factors such as protection of the public.

The government's concern that a reduced sentence would not meet the punishment factor also ignores Mr. Wright's arguments. Obviously, when this Court made its original decision, there was not an ongoing pandemic that made Mr. Wright at risk of dying or becoming severely ill. Even more importantly, Mr. Wright could still see out of one of his eyes at sentencing. Today, the Court's decision about adequate punishment must be weighed against the backdrop of the COVID-19 pandemic and the loss of Mr. Wright's sight – a collateral consequence of custody that the Court surely did not intend. The BOP has already proven that it cannot adequately care for Mr. Wright. It's mistreatment of his glaucoma caused him to lose eyesight in both of his eyes. If Mr. Wright were to contract COVID-19 and suffer severe medical complications from it, potentially even death, certainly that kind of collateral consequence would be devastating.

### III.   CONCLUSION

For these reasons, and the reasons outlined in the motion for a reduction in his sentence, Mr. Wright requests this Court grant his motion for compassionate release.

Respectfully submitted,

SER-016

1

2  Dated:  October 9, 2020                  *s/ Chandra L. Peterson*
                                            Federal Defenders of San Diego, Inc.
3                                           Attorneys for JOEL WRIGHT

4                                           Email:  Chandra_Peterson@fd.org

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit AA

**CHANDRA L. PETERSON**
California State Bar No. 306935
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chandra_Peterson@fd.org

Attorneys for JOEL WRIGHT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 16CR0354-DMS |
| Plaintiff, | |
| v. | DECLARATION OF GREGORY MURPHY |
| JOEL WRIGHT, | |
| Defendant. | |

I, Gregory Murphy, declare, under the penalty of perjury, the follow is true and accurate to the best of my knowledge.

1) I was employed with Federal Defenders of San Diego from October 2006 to April 2017.

2) During my employment at Federal Defenders, I was appointed to represent Mr. Wright.

3) When I first met him, Mr. Wright had very limited sight, but he was able to see some things.

4) He would hold up paper close to his face so he could read what was on it.

5) After Mr. Wright was transferred to GEO, he stopped receiving the treatment he needed for his glaucoma.

6) Mr. Wright's vision deteriorated significantly while he was in custody.

7) By the time Mr. Wright reached sentencing, he was completely blind and

1    could no longer read any documents.

2    Signed in Seattle, Washington, on October 9, 2020.

3

4    DATED: 10|9|2020

5    Gregory Murphy

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

16CR0354-DMS

ROBERT S. BREWER, JR.
United States Attorney
PETER KO, CBN 191994
Assistant U.S. Attorney
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel.: (619) 546-7359
Email: peter.ko2@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) No. 16CR0354-DMS |
| | ) |
| | ) Date: None set |
| v. | ) Time: None set |
| | ) |
| | ) RESPONSE IN OPPOSITION TO |
| JOEL WRIGHT, | ) WRIGHT'S MOTION TO REDUCE |
| | ) SENTENCE PURSUANT TO FIRST STEP |
| Defendant. | ) ACT (2018)/18 U.S.C. § |
| | ) 3582(c)(1)(A)(i) |
| | ) |

Wright has served about 56 months of his 188-month sentence for trying to rape infants. He seeks a reduction to time served or to have the rest of his sentence changed to home confinement because of his medical issues and Covid-19. The motion should be denied. Wright is dangerous, and the medical problems he cites now are essentially the same problems that did not prevent his crimes.

1. Federal courts ordinarily cannot modify sentences once imposed. *Dillon v. United States*, 560 U.S. 817, 819 (2010); 18 U.S.C. § 3582(c). Section 3582(c)(1)(A) is a "rare exception" to that general rule. *United States v. Smeltzer*, 2020 WL 2797493, at *1 (S.D.Ca. May 29, 2020). The statute grants discretion to

1  reduce a sentence if, after considering the factors in 18 U.S.C.

2  § 3553(a), a court finds "extraordinary and compelling reasons"

3  that warrant a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). The

4  statute also requires consistency with Sentencing Commission

5  policy statements, 18 U.S.C. § 3582(c)(1)(A), which separately

6  say Wright must not be a danger to others. USSG § 1B1.13(2),

7  p.s.; *United States v. Spencer*, 2020 WL 5498932, at *2 (6th Cir.

8  Sept. 2, 2020) (unpublished).

9       Wright does not acknowledge the latter requirement, see

10  Mtn. 8-9 (claiming "initial step" for 3582(c)(1)(A)(i) analysis

11  is determine if defendant "has exhausted administrative

12  remedies," "then look" to determine whether defendant has shown

13  extraordinary and compelling reasons," and "last step is to

14  decide whether, in light of the factors in § 3553(a), a

15  reduction is warranted"), much less prove he is not a danger.

16  Cf. *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014)

17  (defendant's burden to show eligibility for 3582(c)(2)

18  reduction). That and the 32 pages he inks without saying what he

19  did beyond calling it "undoubtedly severe" and "incredibly

20  serious," Mtn. 28, are an implicit concession his crime is so

21  far beyond the pale to be unmentionable. In 2014, Wright

22  traveled from Ohio to Tijuana to "adopt" a child. PSR, para. 6-

23  7, 86. The adoption was not legitimate. Wright handed over the

24  fee in a Tijuana hotel to a person he met online and did not

25  succeed only because the person took off with his money. *Id.*,

26  para. 6. Despite already being legally and functionally blind,

27

28

1  Wright made it back to the United States and returned to Ohio.
2  See *id.*, para. 7, 19, 94; Mtn., Ex. A.

3      In May 2015, Wright posted an ad that he would pay parents
4  $150 to watch their children. A concerned reader told police.
5  PSR, para. 25, 81. In July 2015, again online, Wright solicited
6  a "travel guide" for Tijuana. His true intentions came out
7  shortly. He asked about adopting a four-year old girl and said
8  he wanted to have sex with a baby "under age one." He proposed
9  videotaping the act and selling it for money. He claimed to have
10 "played with" and "made it very close" to "go[ing] all the way
11 before" with "a year old." *Id.*, para. 8-9. He later proposed in
12 revolting detail specific sex acts he and another would perform
13 on an "infant baby" and a four-year old. *Id.*, para. 10. He
14 planned to "adopt" the latter and proposed "giv[ing] you the 4
15 as a present after I finish … and you would have the 4 to keep."
16 *Id.*, para. 12. Wright eventually canceled his travel plans and
17 told the person with whom he had been speaking not to contact
18 him again. *Id.*, para. 13. But less than three weeks later he
19 posted another solicitation online for a "female tourguide
20 [sic]" in Tijuana. *Id.*, para. 14.

21     Within a couple weeks Wright again had admitted his real
22 objective was "to adopt/own a baby girl (under the age of 3) and
23 I want to have intercourse with her after I own her but don't be
24 telling people that." *Id.*, para. 15. Told there were three girls
25 "to rent," ages one, two, and three, Wright asked, "[F]or the
26 baby girl to have an overnight can I fully penetrate her and how
27 old is she …?" In a series of exchanges, Wright asked the

28

supposed female "tour guide" "will you stay for a little while
in the hotel to watch me with them and video some of me playing
with them." He claimed, "I have some experance [sic] in the past
and yes I plan on doing oral as well baby girls are so good at
sucking and penetrating is so much fun with them and well
chasing them around and doing all that stuff is a lot of fun I
am glad you will be able to video it and spend the time with me
and I am looking forward to being your friend." Wright said he
would "bring the money and all that good stuff. And yes I will
bring some candy and I will also bring some lubricant for the
babies to make them nice and soft. But I do plan on penetrating
fairly hard." *Id.*

The next day Wright said "virgin babies are the best … yes
I want the 1 2 and 3 year old that you have found for me." He
said:

> [W]ith the 3 year old I will be the hardest to and I will
> be kind of hard with the 2 year old but I will be gentle
> with the 1 year old and first I will start out gentle with
> the older one and then get gradually harder as they are
> warmed up. I do plan on spanking them as well to get them
> in the right position. And I think with the older 3 year
> old I will be kind of hard to and spank hard because well I
> like them when they get a little mad and start crowlling
> [sic] about and you have to chase them around the room. We
> will need to get some children's tylonol [sic] to relax
> them and candy to help them be relaxed … [W]e can totally
> sell the videos and make money … [A]ll I ask is when you
> take the video not to show my face … if they haven't been
> penetrated before they tend to bleed a little the first
> time – so we will need cream and wipes.

*Id.*, para. 16. Over the next few days, Wright asked for
assistance tying up the two- and three-year olds so they "don't
run off in the middle of the night," said he picked up "infant

1   pain relief med and a pretty outfit," and said he would "try to
2   find some lube." *Id.*, para. 17-18.

3       On January 28, 2016, Wright flew from Ohio to San Diego and
4   was arrested. His duffle bag had a child's bottle, a Disney
5   onesie, candy, a pacifier, lubricant, and children's pain relief
6   medication. He also had $2151 in currency. *Id.*, para. 21. A
7   search of his Ohio dorm room found a computer with Internet
8   browser searches that referenced "toddler girl spanking,"
9   "baby," and "baby sex." Deleted text on the computer ominously
10   said, "I normally don't have relationships with kids this old,
11   however, simply because they are at the age where they talk and
12   tell things … a child that talks about his sex life can get you
13   into LOTS of trouble! LOTS! In most places, sexual intercourse
14   with a child that is under the age of 13 is called RAPE, even
15   when the child was a WILLING PARTICIPANT and no harm was done,
16   and can be punishable by up to LIFE IN PRISON, so be DAMN
17   careful!!" *Id.*, para. 24. An acquaintance reported Wright had a
18   long history of babysitting young children. *Id.*, para. 25.

19       At sentencing the court accurately called this "extreme
20   predatory" conduct targeting the most vulnerable. Clerk's Record
21   (R) 59 at 36. The only possible explanations for Wright's year
22   and a half-long campaign are he did not care, his sense of right
23   and wrong are broken, he could not control himself, or some
24   combination of two or all three. None of these possibilities
25   augurs well for making sure something similar does not happen
26   again especially when, for whatever it might add, Wright has not
27   yet gone through sex offender treatment.

28

1    To the extent his motion addresses danger, Wright seems to

2    suggest his medical problems, "full" blindness, and dependence

3    on others make him less a threat now. See Mtn. 2-3; *id.*, Ex. F.

4    But Wright largely had the same problems and supposed

5    limitations when he committed his crimes. He already essentially

6    was blind, was beset with medical problems and dependent on

7    others, had greatly restricted mobility, and needed many

8    accommodations. See, e.g., PSR, para. 94 (Wright is "blind in

9    his right eye and can only see shadows in his left eye" and

10   "only time he can see, with little clarity, is when it is two

11   inches from his face"); *id.*, para. 95-108; Mtn., Ex. A (2013

12   certification Wright is legally blind in both eyes); *id.*, Ex. E

13   (2011 doctor's letter summarizing learning and mobility

14   limitations). None of those circumstances prevented his repeated

15   online solicitations, communications with others, acquisition of

16   items to facilitate the planned rapes, or solo cross country and

17   international travel. *United States v. Hope*, 2020 WL 4742875, at

18   *3 (S.D.N.Y. June 2, 2020) (rejecting claim by paraplegic

19   defendant that "he 'is so physically debilitated that he does

20   not pose a danger to the public'"; "the existence of these same

21   conditions did not impede him from committing the [sex] crimes

22   for which he is currently incarcerated"). Wright overcame his

23   limitations which may be more a sign of his determination and

24   the power of his interest.

25       2.   Wright's failure to prove he is not a danger defeats

26   the motion to reduce his sentence. The motion also should be

27   denied because even if he had made that showing and his medical

problems are extraordinary and compelling,[1] reduction remains discretionary, not mandatory. *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020); see also 18 U.S.C. § 3582(c)(1)(A) ("may reduce").

Wright naturally is preoccupied with his self-interest, but sentencing is only partly about what is best for a defendant. Most 3553(a) factors are directed towards the public interest. Those considerations all weigh heavily against reduction. As the court already recognized, Wright's crime was "simply stated, horrific," "most deserving of punishment for punishment's sake alone," and "most deserving of imposing a sentence that will protect society." R 59 at 34; see 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A) & (C). The reduction that Wright seeks—effectively to five years of imprisonment (or even five years of imprisonment and 10 years of "home detention," Mtn. 27) for 18 months of trying to rape infants and "adopt" one of his own to use as a sex toy—would undersell the gravity of his crime, provoke questions about the sensibility and justice of the law, promote an undesired message that such conduct is not always met harshly, and (without persuasive reason to think there is a high likelihood Wright will not re-offend) endanger "the most vulnerable of society." R 59 at 35 ("there has to be a sentence that focuses on punishment and deterrence and protection"); see 18 U.S.C. § 3553(a)(2). It would be several years below the

---

[1] Wright says he is 5-7, 218 pounds, and obese. Mtn. 13. The PSR listed him as 5-3, 175 pounds. PSR, page 2. We do not know which is accurate, but the PSR's dimensions still would be a BMI 31.

recommended range, R 59 at 30 (168-210 months); 18 U.S.C.
§ 3553(a)(4)(A), and differ greatly from sentences ordinarily
imposed for Wright's crime. United States Sentencing Commission,
Mandatory Minimum Penalties for Sex Offenses in the Federal
Criminal Justice System, January 2019, at 26, available at
www.ussc.gov/sites/default/files/pdf/research-and-
publications/research-publications/2019/20190102_Sex-Offense-
Mand-Min.pdf (average sentence in FY16 for all defendants
sentenced under a sex abuse guideline was 191 months and average
for defendants convicted of mandatory minimum like Wright was
252 months); see 18 U.S.C. § 3553(a)(6).

Wright's motion rests heavily on the premise that his life
is at risk because of his condition, Covid-19, his facility, the
Bureau of Prisons, and custody in general. Mtn. 18-25. No doubt
the present circumstances are concerning and difficult. They are
everywhere for everyone. But at points Wright relies on outdated
or inaccurate information. He suggests new prisoners at his
facility are not tested for Covid-19. Mtn. 19. The BOP tests all
new inmates. The methods have evolved. The current practice is
each institution screens every new inmate "on arrival" with "a
symptom screen, temperature check, and an approved viral PCR
test." Bureau of Prisons, Aug 5, 2020 Memorandum for All Chief
Executive Officers re: Coronavirus (Covid-19) Phase Nine Action
Plan at 6, available at www.documentcloud.org/documents/7016444-
BOP-Phase-9-Covid-Action-Plan.html (last visited Oct. 1, 2020).
Prisoners then are quarantined for at least 14 days or, if
symptomatic or the initial test is positive, isolated until they

recover. Quarantined prisoners with no symptoms only move to
general population after a final temperature check and lab test
are negative. *Id.* at 6-7. This is just one of several steps the
BOP has taken to fight exposure and spread. *Id.* at 1-11.

Wright cites problems specifically at FCI Danbury. Mtn. 18-
19. Danbury had issues earlier this year. Current statistics
updated daily, however, report two positive inmates and no
positive staff at the facility. Covid-19 Cases, Bureau of
Prisons, available at www.bop.gov/coronavirus/ (last visited
Oct. 2, 2020). As of late July 2020, Danbury also had reviewed
313 "medically vulnerable" inmates (including Wright) and
released 119 to "home confinement or community placement." Yale
Law School, Clinic Reaches Settlement Agreement in Bureau of
Prisons Covid-19 Case, July 28, 2020, available at
law.yale.edu/yls-today/news/clinic-reaches-settlement-agreement-
bureau-prisons-Covid-19-case (last visited Sept. 29, 2020). FCI
Danbury's population is now 77 inmates below where it was six
months ago. Compare FCI Danbury, available at
bop.gov/locations/institutions/dan/ (659 inmates as of Oct. 2,
2020) with FCI Danbury, available at
web.archive.org/web/20200418153730/https://www.bop.gov/locations
/institutions/dan/ (736 inmates as of April 18, 2020). Danbury
is not risk-free; nowhere is, custodial or otherwise. But the
facility has been headed in the right direction and is in better
condition than portrayed.

Wright says he is not receiving sex offender treatment,
e.g., Mtn. 5, so the § 3553(a)(2)(D) goal of providing him with

needed treatment "would be best met out of custody." *Id.* at 31. Wright has not received treatment *yet*. Motion aside, he is not scheduled to be released for almost nine years. There is still ample time to send him to a program later in his term, closer to his release.

Wright points to his personal history and those who support him. E.g., Mtn. 28. Wright certainly has achieved much considering the obstacles he faced from birth, and several have vouched for his character beyond the crime. See, e.g., PSR, para. 88. But Wright also apparently hid a dark, significant part of his life from everyone—including his mother who may still think he is innocent, Mtn., Ex. C—which raises questions about how well those who think they know him do know him. Whatever Wright may have shown others, the truly kind and considerate do not dream about or act on raping and "giv[ing]" away infants.

Wright maintains he has good character and says he does not "believe[] what he was going to do is acceptable behavior" or "that he should get to act on these sexual tendencies." Mtn. 28. The text recovered from his computer suggests differently. See PSR, para. 24. So does his conduct, or presumably he would not have done the things he did. At best, Wright rationalized his beliefs and actions to make them acceptable to him which, if it is different, is not by much. See Mtn., Ex. V (noting Wright claimed to have "developed thinking patterns to make some sense of the behavior (for example, 'very young children will think

1   it's just play, they will not remember so they will not be hurt,

2   if the parents allow it, it is okay')").

3       Finally Wright remarkably says his crime is "mitigated,"

4   apparently because he is "relieved" he was arrested before he

5   raped anyone. Mtn. 28; see also *id.* at 4-5. Wright's relief

6   might be more convincing if it had prevented him from flying

7   cross country with candy, lubrication, pain medication, and

8   cash. Even if he was happy to be caught, that does not make his

9   plan and intention to rape babies less serious or troubling than

10  it seemed—i.e., mitigated. If anything, it suggests he knew he

11  was doing wrong and could not help himself. That is only more

12  reason not to release him sooner than necessary as it renders

13  meaningless assurances that the same or similar thing would not

14  happen again.

15      The motion to reduce Wright's sentence should be denied.

16      DATED:  Oct. 2, 2020          Respectfully submitted,

17                                    ROBERT S. BREWER, JR.
                                      United States Attorney
18
                                      s/Peter Ko
19                                    _____
                                      PETER KO
20                                    Assistant U.S. Attorney

21

22

23

24

25

26

27

28